IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

| | | |
|---|---|---|
| DANNY DEE HELDENBRAND | § | |
| v. | § | CIVIL ACTION NO. 6:21cv214 |
| DIRECTOR, TDCJ-CID | § | |

REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

The Petitioner Danny Heldenbrand, a prisoner of the Texas Department of Criminal Justice, Correctional Institutions Division proceeding *pro se*, filed this petition for the writ of habeas corpus under 28 U.S.C. §2254 complaining of the legality of his conviction. The petition has been referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. §636(b)(1) and (3) and Local Rule CV-72 of the Local Rules of Court for the Eastern District of Texas.

**I. Background**

Petitioner was convicted of indecency with a child by sexual contact, receiving a sentence of 16 years in prison. In affirming his conviction, the Twelfth Judicial District Court of Appeals explained as follows:

> At trial, the evidence showed that Appellant often held his young daughter, S.H., from behind while in bed with his erect penis touching her legs. On one occasion, when S.H. was around twelve years old, Appellant paid her in snacks to draw on his back with a pen. While she was doing do, he allowed his erect penis to touch her leg.

Heldenbrand v. State, slip op. no. 12-18-215-CR, 2019 Tex. App. LEXIS 2949, 2019 WL 1760120 (Tex.App.-Tyler, April 10, 2019, discretionary review refused August 21, 2019). The State's brief on appeal provided the following factual background:

> After separating from her mother [Marie] and during visitation with his five or six-year-old daughter, S.H., [Heldenbrand] began a pattern of uncomfortable touching or "cuddling." This cuddling would occur at night in [Heldenbrand]'s bed with his arms around S.H.'s stomach from behind such that she could feel his erect penis rubbing against her leg, or when they would

1

draw their fingers along each other's backs or legs. During this latter type of cuddling, [Heldenbrand] would often trace his fingers on S.H.'s back, legs, and buttocks after unhooking her bra as she lay on her stomach. On one occasion in 2015, when S.H. was drawing on [Heldenbrand]'s back in her grandparents' bedroom, she felt his erect penis touch her knee and then observed it sticking out of his clothes. She told her grandmother something about the incident soon after, but [Heldenbrand] accused S.H. of lying. [Heldenbrand] began telling her regularly, "[d]o not tell your mother or I will lose you kids," and that he was "broken." In addition to "cuddling" S.H., [Heldenbrand] had encouraged her to watch pornography, masturbate in the shower after demonstrating with his hands, and had kissed her up and down her back and on the lips as she lay in his bed trying to sleep. In May of 2016, S.H. revealed the 2015 penis-touching incident in her grandparent's bedroom to her mother, Ms. Cross, and to a therapist, Ms. Martinez, in June of that year. S.H. was thirteen years old at the time of her outcry.

Petitioner also sought state habeas corpus relief in cause no. WR-92,368-01. This petition was denied without written order on March 31, 2021.

## II. The Petition for Habeas Corpus Relief

Petitioner asserts that: (1) he received ineffective assistance of counsel in that his attorney, Francis Key, failed to do an independent investigation and secure at least 10 defense witnesses who wanted to testify; (2) Petitioner told counsel that he wanted to testify in his own behalf to show the jury that he is actually innocent, but counsel coerced him and told him that the prosecutor would bring up Petitioner's past criminal history and record and give him a much harsher sentence if he testified; (3) counsel did not object to the two outcry witness statements which were inadmissible hearsay, nor did counsel make any objections throughout the entire trial; and (4) there was no evidence or insufficient evidence to support his conviction and he is actually innocent. The Respondent has filed an answer to the petition, to which Petitioner filed a reply. His grounds for relief will be addressed in turn.

## III. Discussion

### A. Review Standards for Ineffective Assistance of Counsel Claims

Petitioner's first three grounds for relief revolve around the conduct of his attorney. In order to prevail on a claim of ineffective assistance of counsel, a state prisoner seeking federal habeas

corpus relief must show that his attorney's performance was deficient and that the deficiency prejudiced him to the point that he was denied a fair trial. Strickland v. Washington, 466 U.S. 668, 678, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This means that the habeas petitioner must establish both that (1) counsel's performance was deficient in that it fell below an objective standard of reasonable competence and (2) the deficient performance so prejudiced the defense that the outcome of the trial was unreliable and there is a reasonable probability that, but for counsel's performance, the result of the trial would have been different. Unless a petitioner makes both showings, he is not entitled to relief. Del Toro v. Quarterman, 498 F.3d 486, 490 (5th Cir. 2007). The burden of proving ineffective assistance of counsel, including the burden of identifying the acts or omissions of counsel which are alleged not to have been the result of reasonable professional judgment, is on the petitioner. Coleman v. Vannoy, 963 F.3d 429, 432 (5th Cir. 2020). General statements and conclusory charges of ineffectiveness will not suffice. Green v. McGougan, 744 F.2d 1189, 1190 (5th Cir. 1984).

A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. This requires a substantial, not merely a conceivable, likelihood of a different result. Cullen v. Pinholster, 563 U.S. 170, 189, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011).

Counsel has wide latitude in making tactical decisions, including formulating a strategy which was reasonable at the time. Strickland, 466 U.S. at 689; Harrington v. Richter, 562 U.S. 86, 107, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011). This means, for example, that it is reasonable trial strategy for counsel to try to cast "pervasive suspicion of doubt [rather] than to try to prove a certainty that exonerates." Id. at 109.

The Fifth Circuit has explained that a conscious and informed decision on trial tactics and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness. Pape v. Thaler, 645 F.3d 281, 291 (5th Cir. 2011). This means that defense counsel's strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable. Rhoades

3

v. Davis, 852 F.3d 422, 434 (5th Cir. 2017), *citing* Strickland, 466 U.S. at 690. A court reviewing those choices is required not simply to give counsel the benefit of the doubt, but to affirmatively entertain the range of possible reasons he may have for proceeding as he did. Feldman v. Thaler, 695 F.3d 372, 380 (5th Cir. 2012).

This assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time; there is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and the defendant must overcome the presumption that the challenged action might be considered sound trial strategy. Strickland, 466 U.S. at 689-90.

In reviewing counsel's performance through the lens of an ineffective assistance claim, the Supreme Court has explained as follows:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf.* Engle v. Isaac, 456 U.S. 107, 133–134, 102 S.Ct. 1558, 1574–1575, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See* Michel v. Louisiana, *supra*, 350 U.S. [91, 101, 76 S.Ct. 158, 100 L.Ed.83 (1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. *See* Goodpaster, The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases, 58 N.Y.U.L.Rev. 299, 343 (1983).

Strickland, 466 U.S. at 689–90.

In the context of analyzing claims of ineffective assistance of counsel, the Supreme Court has explained the standards created by Strickland and 28 U.S.C. §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. Harrington, 562 U.S. at 105.

Application of this doubly deferential review is different from asking whether defense counsel's performance fell below the Strickland standard. The question is not whether the federal court believes that the state court's determination under Strickland was incorrect, but whether that determination was unreasonable - a substantially higher threshold. Knowles v. Mirzayance, 556 U.S. 111, 129 S.Ct. 1411, 173 L.Ed.3d 251 (2009). This is because the state court must be granted a deference and latitude which is not in operation when the case involves review under the Strickland standard itself. Consequently, the Fifth Circuit has stated that even a strong case for relief does not mean that the state court's contrary conclusion was unreasonable; rather, in order to obtain habeas corpus relief, the petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement. Druery v. Thaler, 647 F.3d 535, 539 (5th Cir. 2011).

B. The Witnesses

Petitioner states that Key "failed to do an independent investigation and secure at least ten defense witnesses who wanted to testify." He refers to his state habeas petition, in which he identifies these ten witnesses. These were: (1) Petitioner's mother Susan Heldenbrand; (2) Petitioner's stepfather Douglas Heldenbrand; (3) Elizabeth Kelli Carlisle; (4) Christopher Carlisle, Elizabeth's husband and a long-time friend of Petitioner; (5) Petitioner's aunt Tina Walker; (6) Petitioner's aunt Mary (Vicky) Shoemaker; (7) Petitioner's uncle Bobby Walker; (8) Petitioner's aunt Margarita Walker; (9) Petitioner's brother Chuck Osgood; and (10) Petitioner's sister in law Debbie Osgood. Each of these individuals provided affidavits (docket no. 11-31, pp. 3-31). Three of them - Douglas Heldenbrand, Susan Heldenbrand, and Elizabeth Carlisle - did testify at trial.

Petitioner argued in his state habeas petition that these witnesses were not contacted by Key personally and that Key did not prepare the witnesses who were called at trial. Although Key said that he had expert witnesses, he did not call them. Petitioner contends that had Key called his

witnesses and allowed them to testify, there is a reasonable probability that the result of the proceeding would have been different.

The Fifth Circuit has held that complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and allegations of what a witness would have stated are largely speculative. Gobert v. Lumpkin, slip op. no. 22-70002, 2023 U.S. App. LEXIS 19663, 2923 WL 486 4781 (5th Cir., July 31, 2023), *citing* Day v. Quarterman, 566 F.3d 527, 538 (5th Cir. 2009). In order to prevail on an ineffective assistance claim based on counsel's failure to call a witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the contents of the witness' proposed testimony, and show that the testimony would have been favorable to a particular defense. Id; Alexander v. McCotter, 775 F.2d 595, 602 (5th Cir. 1985).

Christopher Carlisle's affidavit says that he lived with Petitioner from 2007 to 2010 and never saw Petitioner behaving inappropriately or suspiciously with his children, that Petitioner sometimes babysat for Carlisle, and that Carlisle's daughter loved coming to see Petitioner and his children and never complained of any inappropriate or unusual behavior. The affidavit also says that Petitioner's lawyer never attempted to contact Carlisle, but it does not indicate that Carlisle was available to testify or would have done so.

Tina Walker's affidavit says that she lived with Petitioner for a time in Conroe and that on one occasion, S.H. came to her and told her about a situation in which S.H.'s mother's boyfriend's oldest son came to her at night and touched her. Tina Walker also stated that she went with Petitioner on a CPS visit and the CPS worker, who was rude and mean, told Petitioner that S.H. "had deeper issues." The affidavit says that "I feel as though if I would of been informed I would of made a good witness, I was never called upon for anything."

Mary Shoemaker's affidavit says that she stayed at Petitioner's house for weeks at time, such as when her mother broke her leg and she stayed at Petitioner's house where her mother was being cared for. She said that she has never seen any kind of inappropriate behavior, sexual or otherwise,

and that she has always noted Petitioner to be a "wonderful father." Mary Shoemaker stated that she attended court hearings with Petitioner of S.H.'s court case with an individual named Michael A., who was charged with sexual violation of a child.[1] She stated that she would leave her children with Petitioner and that "I do feel I would have been a good witness for [Petitioner], but was never called to do so. I would go to court today and be a good witness if only given the opportunity."

Bobby Walker's affidavit says that on one occasion when Petitioner lived in the town of Cut and Shoot, outside of Conroe, he stopped by to visit and saw Petitioner playing with his children, who seemed happy. Walker stated that Petitioner "loved his kids like a real dad should" and that he, Walker, would never be reluctant to leave his own children in Petitioner's care. He stated that he believed his testimony would have benefitted Petitioner but he had no request from Petitioner's lawyer.

Margarita Walker's affidavit states that from all she has seen and heard, Petitioner is "a very good father as well as a good person." She said that when Petitioner was accused and convicted as a bad father, she knew that someone had told lies about him. She felt like her testimony could have benefitted him but she had no request from his lawyer.

Chuck Osgood's affidavit stated that he knows a lot about Petitioner and Marie's relationship with their children, because of living with them for years before and after they split up and because Osgood's ex-wife is Marie's sister. His children have been raised with Petitioner's children and are always around each other. Osgood states that it was his son Caleb who told S.H. that she needed to tell her father what had happened when she was molested by Michael A. He says that "I out of anybody knowing [Petitioner] all our lives should have been called to testify on his behalf, but [Petitioner's attorney never contacted me to be a witness in court, and I feel I could have benefitted his case. If [Petitioner's] attorney had gathered witnesses that knew everyone involved, the outcome would have been different. I would have testified at any given time then and now."

---

[1]S.H. testified that she was inappropriately touched by "Michael A.," apparently a cousin once removed, when she was seven, and Michael went to jail for it. (Docket no. 11-25, p. 17, 44).

Debbie Osgood's affidavit says that she, her husband Chuck, and her stepson Caleb were around Petitioner and his kids all the time since Chuck's ex-wife and Petitioner's ex-wife are sisters. She stated that S.H. confided in her about the horrible things Michael A. had done but she (S.H.) "did like the extra attention that her mom was giving her now." Debbie says that she thought to herself that it was horrible for S.H. to be going through this at such a young age, and then a year or so later, S.H. told Debbie about boys at school trying to "get with her" and "do adult things" with them. Debbie asked if S.H. had told anyone and S.H. said that she had told her mom. Debbie also stated that she has been around when Petitioner asked S.H. to change her clothes if she was wearing bottoms which were too short or inappropriate low cut shirts.  Debbie said that "I honestly feel that I could have benefitted [Petitioner's] case if his attorney would have contacted me to testify in court."

Of these affidavits, only that of Chuck Osgood clearly indicates that he was available to testify and would have testified at trial. *See* <u>Vasquez v. Thaler</u>, 505 F.App'x 319, 2013 U.S. App. LEXIS 51, 2013 WL 28432 (5th Cir., January 2, 2013) (rejecting affidavits of uncalled witnesses where these affidavits did not state that the affiant would have been available to testify). Chuck Osgood's affidavit does not provide any details concerning Osgood's potential testimony other than the fact that it was his son Caleb who urged S.H. to tell Petitioner about a prior sexual assault involving Michael A.

This particular information was before the jury because S.H. herself testified that she told Caleb a little of what Michael had done and Caleb urged her to tell Petitioner, which she did. (Docket no. 11-25, pp. 17, 44-45).  Petitioner has not shown that the anticipated testimony as set out in Chuck Osgood's affidavit would have been favorable to him, much less that but for the failure to call Osgood and elicit this testimony, the result of the proceeding would probably have been different.

As noted above, Douglas Heldenbrand, Susan Heldenbrand, and Elizabeth Carlisle did testify at trial. In his affidavit, Douglas Heldenbrand said that he was called as a witness and asked Key

about being prepped for trial, and Key told him not to worry about it because he, Key, wanted Heldenbrand to "sound authentic and not coached." Heldenbrand said that sounded kind of naive but Key replied that he knew what he was doing. Key asked for a list of character witnesses and Heldenbrand and his wife made a list of some 15 to 20 people. The trial began on Monday and that evening, Key asked Susan Heldenbrand if she could contact the witnesses and have them in court in the morning, but only one witness was able to come with such short notice. Heldenbrand also stated that Key asked them to pick up papers pertaining to the case from various people, including a psychological report. He said that Key told them that he worked for their son and could not give them information without Petitioner's consent, but Key violated this trust multiple times. Heldenbrand stated that after Susan Heldenbrand read the report on S.H.'s psychological report, Key said that "it would come out in the trial anyway," but when Heldenbrand asked Key if he brought it up in court, Key said no. He also asked if Petitioner would be able to testify in court, but Key said that Petitioner was "just a piece of raw meat and they would eat him up."

According to Douglas Heldenbrand's affidavit, Key told them that this kind of case would cost approximately $10,000.00. Douglas says that he came up with a $2,000.00 deposit and prepared to sell his gun collection to raise money. He told Key about this and Key said he would take the guns and ammunition as payment. Some time later, Key asked if they were still interested in getting an expert witness since the other side had one, and that he could get one for $2,000.00. Key called back later and said that if they wanted the expert he needed $800.00 that day because he wanted to buy his mother a gift. Susan drove to Tyler to give Key $800.00, and then later returned to Tyler to give him the remaining $1,200.00. However, Douglas says that there was no expert witness at trial. When they confronted Key about the lack of an expert and getting some of their money back. Key said that "they would work it out." Susan suggested that he could return some of the guns, and Key said that he had sold the guns and ammo and had not received anywhere near $10,000.00; however, Douglas says that if he sold them for less, then he was a fool. After that meeting, Key stopped answering letters and calls.

Shortly before the trial, Douglas Heldenbrand states that he asked Key if the lawyer had talked to Petitioner, and Key replied that he had seen Petitioner two or three times and for only a couple of minutes - once to get a power of attorney for Petitioner's mother, once to watch a film, and once to give him clothes for court. During trial, Douglas says that he and Susan had to sit in the hall. Key would come out of court frustrated. Key advised them several times that he could not tell them what S.H. or Maria were saying, but he would then tell them anyway.

Douglas says that "to be honest, I don't know if being prepped before I was called to the stand would have help[ed] my son or not. Being a witness, I was not allowed to be in the courtroom to see or hear exactly what went on. But there is no doubt in my mind that Mr. Key failed in his job as an attorney. From my point of view, all he did was collect our money, blow smoke about how this case looked good, and then sit around the courtroom looking lost." (Docket no. 11-31, pp. 8-9).

At trial, Douglas testified that Petitioner tried to make time for his children and played with them at the park or with board games. He stated that he saw elements of Petitioner's parenting that he disagreed with, but never saw anything he believed to be harmful or detrimental.

With regard to a specific incident, in August of 2015, Douglas Heldenbrand testified that in mid-August of 2015, Susan, S.H., and Petitioner were in Douglas' bedroom watching a movie. Douglas went through the bedroom to take the dog out. Petitioner was laying across the foot of the bed and Susan and S.H. were up at the headboard. After about five or ten minutes, Douglas stated that he heard Susan walk down the hallway. Douglas heard the dog bark so he went back through the bedroom to let it in. Petitioner was asleep on the bed and S.H. was up against the headboard watching TV. Douglas stated that he brought the dog in and went to the computer room. After about two or three minutes, he heard Petitioner and S.H. arguing. When he heard what they were arguing about, Douglas told S.H. "that was BS" because he knew it could not be true; he explained that "it couldn't have happened from the clothing that Danny was wearing at the time." (Docket no. 11-25, pp. 173-77).

Douglas Heldenbrand stated that he never witnessed any behavior which would support "any of the things that were said" and that he never witnessed any behavior which was a concern to him. He said that he saw Petitioner forbid S.H. from wearing inappropriate clothing and that Petitioner always tried to take time with his children. (Docket no. 11-25, p. 177).

In response to a question about "picking sides" between his son and his grandchild, Douglas stated that it was "really hard to pick sides, [but] it wouldn't be hard to pick sides if I thought for a second that my son was guilty of any of this." He stated that if he thought Petitioner was guilty, then "I would probably be the one in here right now because he wouldn't be safe." (Docket no. 11-25, p. 181).

After discussing problems between Petitioner and Marie and saying that Marie often would not give Petitioner the children when she was supposed to, Douglas Heldenbrand testified that he learned of the allegations against Petitioner for the first time when Marie filed for full custody at the courthouse in Conroe, around the end of April of 2016. He said that he was told of one of two allegations at that time, "and then it seemed like every time we turned around there was another allegation and another story we heard." He added that "the stories seemed to change every time we heard it." (Docket no. 11-25, p. 186).

On cross-examination, Douglas acknowledged that he had seen Petitioner rub S.H.'s back and arms and legs, but said that this was not unusual because Petitioner was a registered massage therapist. He said that after S.H. was molested by Michael, she was very uncomfortable for a while, but then appeared to grow out of it and was always happy, laughing and joking and wanting to play games, never seeming upset or depressed. He said that he believed S.H. was not telling the truth and needed a child psychologist. (Docket no. 11-25, pp. 194-96).

In her affidavit, Susan Heldenbrand stated that she was doing laundry and when she went into the room, she saw Petitioner asleep on the bed. S.H. was sitting behind Petitioner drawing on his back. Susan said that she sat down by Petitioner and began to draw an ocean with a sailboat, but then told S.H. that she had to use the restroom. She did so, and when she came out, Petitioner and

S.H. were in the doorway arguing. S.H. told Susan that she had seen Petitioner's penis and then changed her story and said that she had touched it. She pointed to the top left hand side of the swim trunks Petitioner was wearing and said that she felt it there. Susan told S.H. that she believed her, but in fact Susan could not figure out any way that it could have happened like S.H. said it did.

Susan stated that she discussed all of this with Key, who came to the house and took pictures. However, she said that the first time he came to the house, it was to pick up money and he never got out of his car. Key took Douglas' gun collection which was valued at $10,000 to $12,000, and after that, they only saw Key when he needed money. She said that she picked up and read S.H.'s psychological report which said that S.H. reported hearing voices and displayed psychotic behavior. Susan also stated that after S.H. was molested at age 7, it was Petitioner who took Michael to the police station and pressed charges because Marie did not want to. Susan said that none of this was mentioned in court.

According to Susan, she and Douglas had to wait outside the courtroom because they were witnesses and Key would come out and tell them what was going on. She said that he would come out of court and "tell us how [S.H.] would keep changing her story, and how he didn't know how to do this, while flinging his arms in the air." She said that was on the first day of trial, and that night, she talked to Key on the phone and asked if he had contacted her witnesses and he said no, he had been really busy, but asked if she could do it. Susan stated that she was very upset about this and tried to call everyone she could, but could only find one witness who could come on such short notice.

Susan also said that Key told her about a video he had watched in which S.H. said something about being a good liar. Susan also said that S.H. asked her if Susan would still love her if she lied. She expressed her belief that Marie convinced S.H. that Petitioner had done wrong and needed to be punished, and said "upon my testifying in court, I would have brought all these facts forth, but was not given the opportunity."

At trial, Susan Heldenbrand testified about the August 2015 incident that she came through the bedroom while she was doing laundry. She saw that Petitioner was asleep and S.H. was just sitting there. She went to the bathroom and when she came back maybe two minutes later, Petitioner and S.H. were arguing. Susan stated that she found it hard to believe what was alleged could have taken place in the short time that she was out of the room. (Docket no. 11-25, pp. 210-11, 216).

Elizabeth Carlisle testified that Petitioner was her husband's best friend. She said that she spent time with Petitioner and his family and that Petitioner's children and her children would always play together. She said that Petitioner was a "pretty great father" and that he wanted to take time with the children and was very honest with them. She stated that Petitioner's talks with the children were always age-appropriate and that she never had concerns about leaving her children with Petitioner; likewise, she said that her children never said anything to make her question her ability to leave her children with him.

Elizabeth said that although everybody would wrestle, and they would make teams, there was no touching of inappropriate areas. She said that she had received massages from Petitioner during which she was covered with a blanket, and that sometimes the children would have dance parties. (Docket no. 11-26, pp. 27-28).

On cross-examination, Elizabeth denied knowledge of the allegations against Petitioner, but stated that she did not believe these allegations could be true and that they did not change her opinion of him. (Docket no. 11-26, pp. 33-34).

Thus, in summary, the affidavits of Tina Walker, Mary Shoemaker, Bobby Walker, Margarita Walker, and Debbie Osgood do not specifically indicate that these witnesses were available for or would have testified at trial. As such, they are insufficient on their face. Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010). Furthermore, none of the affidavits presented by Petitioner, including the affidavits of Chuck Osgood, Douglas Heldenbrand, Susan Heldenbrand, and Elizabeth Carlisle, set out any evidence which the jury did not hear, but would likely have led to a different result had the jury heard it. *See, e.g.*, Nichols v. Scott, 69 F.3d 1255, 1286-87 (5th Cir.

13

1995) (rejecting claim of ineffective assistance of counsel based upon affidavits submitted after a hearing, noting that "nor do the April 1992 affidavits show a probability of a different result sufficient to undermine confidence in the outcome"); Johnson v. Cain, civil action no. 13-469, 2015 U.S. Dist. LEXIS 176230, 2015 WL 10123653 (E.D.La., December 4, 2015), *Report adopted at* 2016 U.S. Dist. LEXIS 18959, 2016 WL 63357 (E.D.La., February 17, 2016), *affirmed by denial of certificate of appealability* 2017 U.S. App. LEXIS 29209, 2017 WL 11768425 (5th Cir., April 5, 2017) (rejecting affidavits filed by family members because the petitioner "has not shown that calling these witnesses would have created a reasonable probability of a different outcome at his trial.") To the extent that the affidavits vouch for Petitioner's good character or parenting skills, they are cumulative to testimony presented at trial and thus cannot form the basis for an ineffective assistance claim. *See* Gobert, 2023 U.S. App. LEXIS at *7 (rejecting claim of uncalled witnesses where "much of the information provided in the affidavits is not new and is similar to what was presented at trial.") Petitioner's first ground for relief is without merit.

C. Testifying in his Own Behalf

Petitioner states that he told counsel he wanted to testify in his own behalf to show the jury that he is actually innocent of any crime, but counsel coerced him and told him that the prosecutor would being up his past criminal history and give him a much harsher sentence if he testified; however, Petitioner says that he has no criminal history. He contends that "counsel did not investigate my history and he never explained any of the constitutional rights that petitioner would be waiving."

During the trial on June 27, 2018, toward the end of the day, counsel called Petitioner to testify, and the trial court took a short break. After the jury was excused, the court questioned Petitioner about his testifying, reminding him that the State cannot call him. Petitioner stated that he had talked to counsel about his Fifth Amendment privileges and that he was aware he did not have to take the stand. He acknowledged understanding that he would be just like any other witness and subject to cross-examination by the prosecution. (Docket no. 11-25, pp. 226-27).

14

The trial court noted that Petitioner did not appear to have any prior felony convictions, so there was "nothing that really, I guess, the State can use for that arena." (Docket no. 11-25, p. 228). Petitioner agreed that once he was on the stand, he could not change his mind mid-stream. He said that knowing all this, he wished to waive his privilege.

Key said that they had discussed Petitioner's taking the stand and that Petitioner had expressed a desire to take it in preceding days. Although he described Petitioner as "somewhat uncertain," Key said that Petitioner was predisposed to taking the stand. (Docket no. 11-25, p. 228). However, after a lengthy discussion concerning the playing of a Children's Advocacy Center video, Key elected to call Marie Cross as his next witness. (Docket no. 11-25, p. 236).

The following day, after S.H. was recalled and testified, Key told the court "I'm going to close. I told my client - [inaudible] - he's okay with not testifying." The jury was sent out and Key again said that Petitioner was okay with not testifying. (Docket no. 11-26, pp. 46-47).

The trial court asked Petitioner about this, and Petitioner asked to speak to counsel. After he did so, the court again reminded Petitioner that the state cannot call him to the stand, adding that "ultimately the final decision is yours because it is your privilege, not the lawyer's." Even if the lawyer advised him not to take the stand, the court advised Petitioner that if he wanted to take the stand and testify, he could override the lawyer's recommendation. (Docket no. 11-26, pp. 47-48). Petitioner acknowledged that he understood.

The court then asked if it was Petitioner's desire to claim his Fifth Amendment privilege and not take the stand, or to waive it and take the stand. Petitioner replied that he was going to claim the privilege. The court said that what would happen would be that when the jury was brought back in, Petitioner's lawyer would rest his evidence, and Key agreed. The prosecutor said that he would close, so the court told Petitioner that if this happened, the evidence would then be over and the jury would deliberate. (Docket no. 11-26, pp. 48-49).

The court told Petitioner that it was like a fork in the road and he could go either way, taking the stand and testifying or claiming his privilege and not testifying. The court said it did not matter

which road Petitioner took, but they would need to know which he wanted to do. A pause in the proceedings occurred and the court asked if Petitioner needed to talk to his lawyer, and Petitioner said that he wanted to "claim the Fifth." (Docket no. 11-26, p. 49).

The Fifth Circuit addressed the issue of a defendant allegedly wanting to testify, but not being allowed to do so, in U.S. v. Mullins, 315 F.3d 449 (5th Cir. 2002), a Section 2255 proceeding. Where the defendant claims that his attorney interfered with his right to testify, the Strickland standard applies. Id. at 453. The Fifth Circuit emphasized that the decision to testify belonged to the defendant and that counsel must ultimately accede to the defendant's wish to testify.

When this is not done, however, the defendant must show a reasonable probability that, absent the alleged error, the factfinder would have had a reasonable doubt concerning guilt, and that the errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Id. at 456.

The colloquy in court makes clear that Petitioner was aware he had the right to testify if he wanted and that the final decision was his, not counsel's. Petitioner's affidavit, attached to his state court petition, claims that he was coerced by Key telling him that the prosecutor would bring up his criminal history record, but the trial court made clear to Petitioner that he had no criminal history which the prosecution could use against him.

The Fifth Circuit has explained that in order to prevail on a claim that counsel was ineffective for preventing a petitioner from testifying, he must put forth something more than conclusory assertions. United States v. Martinez, 181 F.3d 627, 628 (5th Cir. 1999); see also Underwood v. Clark, 939 F.2d 473, 476 (5th Cir. 1991). This comports with the established rule that conclusory allegations do not raise a constitutional issue in habeas proceedings. Ross v. Estelle, 694 F.2d 1008, 1011-12 (5th Cir. 1983); Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990). Petitioner has offered nothing beyond his own conclusory assertion that counsel coerced him into not testifying.

16

Nor has Petitioner offered anything to show a reasonable probability that, absent the alleged error, the factfinders would have had a reasonable doubt respecting guilt. He presents no indication of what he would have testified to, but simply says that "had he got to testify, and had his witnesses been called, the outcome of the proceeding would have been different." This is not sufficient to show prejudice under Mullins. *See* Griffin v. Vannoy, civil action no. 19-684, 2022 U.S. Dist. LEXIS 218337, 2022 WL 17365734 (M.D.La., November 3, 2022), *Report adopted at* 2022 U.S. Dist. LEXIS 217573, 2022 WL 17365243 (M.D.La., December 1, 2022), *aff'd by denial of certificate of appealability* slip op. no. 22-30791, 2023 WL 3974998 (5th Cir., January 27, 2023) (allegation that petitioner "would have told the jury he was innocent" does not amount to information about testimony which would have changed the outcome of the trial). Petitioner's second ground for relief is without merit.

D. Failure to Object

Petitioner complains that counsel made no objections to the two outcry witness statements which were inadmissible hearsay and in fact made no objections throughout the entire trial. He says that both Marie Cross and Susanna Martinez gave outcry witness statements, without objection, and contends that Key failed to investigate defense witnesses made known to him before trial.

The evidence before the jury showed that Marie Cross was the first adult to whom S.H. made outcry, as discussed in Petitioner's appellate brief (docket no. 11-5, p. 15). Cross testified as an outcry witness that on May 31, 2016, S.H. told her that Petitioner had taught her how to masturbate and to watch pornography. Cross stated that she contacted the police and Child Protective Services. (Docket no. 11-25, pp. 76-77).

Cross testified that after she contacted the police, S.H. told her that while she was at Petitioner's house, he had her watch a movie called Fifty Shades of Grey with him. Cross also said that S.H. told her that one night while she was at Petitioner's house, she was sitting on the bed drawing on his back. He had his shorts on but his shirt was off. Cross stated that S.H. told her "I was sitting criss-cross applesauce, and I felt Daddy's boner touch my leg. And I'm sorry I lied to

him, Mommy, but I told him I had to go to the bathroom. I just didn't want to be in there." (Docket no. 11-25, p. 77).

Susanna Martinez, the clinical director at the Childrens Advocacy Center in Conroe, testified that she met with S.H. and Cross on June 7, 2016. Martinez said that according to her progress notes, Cross told her that S.H. had completed a forensic interview in Tyler and had made an outcry against her father. S.H. appeared to be regressed, wanting to sit on her mother's lap. Martinez told S.H. that she did not need to process the outcry until and if she was ready, and provided her with the option of art activity. S.H. initially agreed but then stated a preference to process the trauma. S.H. reported her father allowing her to watch the movie Fifty Shades of Grey at age 11. Martinez said that S.H. also reported "seeing his rubber vagina, playing porn games, still cuddling with us, as she described [Petitioner] unstrapping bra and lifting her shirt to back, and [Petitioner] asking [S.H.] to wear booty shorts." (Docket no. 11-25, p. 154).[2]

Martinez said that these matters were related while Cross was in the room. During the interview, Cross told S.H. that she was "not aware of many things." After Cross left, S.H. mentioned an incident in which she was asked to write on Petitioner's back and "felt his boner." S.H. also said that Petitioner "was always talking about his ding-a-ling, it has a name, it's ginormous." Martinez noted that S.H. "stated only telling interview a fourth of things, but acknowledged reporting important things." (Docket no. 11-25, pp. 153-155).

The Twelfth Judicial District Court of Appeals, in adjudicating this issue, determined that Petitioner failed to show ineffective assistance of counsel because Petitioner could not overcome the presumption that not objecting to Martinez' testimony was trial strategy. Heldenbrand v. State, 2019 Tex. App. LEXIS 2949 at *5. In questioning a witness named Jennifer Subin, a forensic

_____

[2]With regard to the rubber vagina, S.H. explained that she had seen a "toy" at Petitioner's house in the bathtub, which she said had a chest area for a girl and a girl's "private spot." She stated that Petitioner would sometimes hold her, with her back to his chest or stomach, which made her uncomfortable because she could feel his hard penis rubbing against her leg. S.H. stated that Petitioner would rub his fingers on her body and unclip her bra while she was laying on her stomach. (Docket no. 11-25, pp. 23-27).

interviewer with Childrens Advocacy Center in Smith County, Key elicited testimony that when children talk about alleged sexual assaults, they can make allegations and then recant, and then make the allegations again. Subin also said that the details of the allegations could change over time, creating inconsistencies. Key asked if there was a point where the inconsistencies are significant enough "to where they would maybe fall outside the realm of something normal for someone who did actually experience some sort of inappropriate behavior? Where, I guess, the change in what they're telling is so substantially different that it affects their credibility in any manner?" Subin replied "yes, I'm sure there's certain cases where - I know there's certain cases where that happens." (Docket no. 11-26, pp. 11-13).

During his closing argument, Key stated that he had no idea if S.H. "believes it, if she doesn't. But I know that it's just been new allegation after new allegation and inconsistencies." (Docket no. 11-26, p. 63).

In cross-examining S.H., Key elicited testimony that she had talked to her cousin Blake about masturbation and that she had asked Petitioner about it, that in a lot of ways she and Petitioner had a very good relationship and it was sometimes easier for her to talk to him than to her mother about mature topics. (Docket no. 11-25, pp. 50-54). S.H. also said on cross-examination that she had asked Petitioner "a number of times" to allow her to watch Fifty Shades of Grey until he finally gave in and let her watch it. (Docket no. 11-25, p. 59).

Key asked S.H. "do you remember saying you had a dream one time where something happened with your dad," and the dream had "maybe a little bit of sexual content," to which she said yes. (Docket no. 11-25, p. 55). Later in the same cross-examination, when Key was questioning S.H. about how she provided more details in later interviews than in earlier ones, he asked her "and earlier, you said that you'd had a dream involving your dad, and then you weren't sure if it was a dream, is that right?" to which she said yes. Key said "and when you were first interviewed, you said it was a dream, but now it seems like you're saying you think it's real." S.H. replied "it felt like

a dream. But then again, knowing that - it felt too real. It doesn't - it could be a dream, but I really don't think it was." (Docket no. 11-25, p. 61).

Key then started to ask about some of the other things S.H. had said, apparently to imply that they could have been dreams as well, but S.H. interrupted to say that she was not uncertain about "those things." Key asked "you're not uncertain about them, but you just didn't say them before, is that right," to which S.H. said yes. (Docket no. 11-25, p. 62).

A review of the record and testimony in this cause indicates that Key apparently embarked upon a strategy of painting Petitioner as a good and upstanding person through the testimony of Douglas Heldenbrand, Susan Heldenbrand, and Elizabeth Carlisle, and casting aspersions upon S.H.'s testimony by asserting that she added more details in later interviews, such as the interview with Martinez, presumably implying that S.H. had come up with those details later.

Although Petitioner asserts that counsel should have objected to Cross' testimony as inadmissible hearsay, Texas law provides a hearsay exception for the testimony of an outcry witness, defined as the first adult person other than the defendant to whom the victim made a statement describing the incident in a discernible manner. Kittelson v. Dretke, 426 F.3d 306, 309 n.4 (5th Cir. 2005); Tex. Code Crim. Pro. art. 38.07. As the Twelfth Court of Appeals observed, Petitioner argued on appeal that Cross was the first adult to whom S.H. made outcry. Heldenbrand v. State, 2019 Tex. App. LEXIS 2949 at *3. Petitioner has not identified any legal basis upon which counsel could have objected to Cross' testimony. The Fifth Circuit has explained that counsel cannot be ineffective by failing to make meritless objections. Turner v. Quarterman, 481 F.3d 292, 298 (5th Cir. 2007). This claim is without merit.

Petitioner has failed to overcome the presumption that counsel's failure to object to Martinez as a second outcry witness was part of a sound trial strategy, nor has he shown that the state court's rejection of this claim was an unreasonable determination of the facts based on the evidence in the record or was contrary to or an unreasonable application of established federal law as determined by Supreme Court precedent. 28 U.S.C. §2254(d); Schriro v. Landrigan, 550 U.S. 465, 473-74, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007). His claim for relief on this ground is without merit.

Petitioner also complains that Key did not make any objections at trial. However, he does not identify anything in his federal habeas petition to which he believes counsel should have objected, much less show that the failure to object amounted to constitutionally ineffective assistance or that but for the failure to object, the result of the proceeding would probably have been different. In Evans v. Dretke, civil action no. 4:02cv280, 2005 U.S. Dist. LEXIS 28962, 2005 WL 2387572 (E.D.Tex., September 27, 2005), the petitioner complained that his attorney failed to make any objections on his behalf. After observing that the record directly refuted the petitioner's claim in this regard, the court went to observe that "petitioner fails to state what objections should have been made by his trial counsel and when his trial counsel should have made them," *citing* Schlang v. Heard, 691 F.2d 796, 799 (5th Cir. 1982) *and* Ross v. Estelle, 694 F.2d 1008, 1011 (5th Cir. 1983). *See also* Northup v. Thaler, civil action no. C-10-085, 2010 U.S. Dist. LEXIS 91285 (S.D.Tex., August 10, 2010), *Report adopted at* 2010 U.S. Dist. LEXIS 91308, 2010 WL 3505123 (S.D.Tex., September 2, 2010) (rejecting claim that counsel should have made objections where petitioner did not identify reasons for the objections or specify what matters they should have concerned); Pena v. Stephens, civil action no. 2:14cv334, 2015 U.S. Dist. LEXIS 79043, 2015 WL 3770585 (S.D.Tex., April 1, 2015), *Report adopted at* 2015 U.S. Dist. LEXIS 78116, 2015 WL 3882440 (S.D.Tex., June 17, 2015) (same).

In his state habeas petition, Petitioner complains that counsel failed to object to leading questions posed to S.H., but he does not identify any specific questions. He points to pages 9 and 10 of volume 14 of the record (docket no. 11-25, pp. 9-10), but these pages cover the very first part of S.H.'s testimony, where she was saying how old she is, where she lives, and where she goes to school. To the extent any of these questions were leading, they could simply have been rephrased, and in any event, Petitioner does not explain how the failure to object to leading questions likely prejudiced his defense. *See* Burnett v. Collins, 982 F.2d 922, 930 (5th Cir. 1993) (rejecting claim of ineffective assistance of counsel for failure to object to leading questions where the questions could have been rephrased and the petitioner failed to show prejudice). This claim is without merit.

21

The state habeas court made findings of fact saying that Key was ordered to respond to petitioner's state habeas petition but never did.  A writ of attachment was issued on October 13, 2020, and a Smith County deputy discovered that Key was in a hospital in the Dallas area with "significant medical issues" and possible surgery.  On January 8, 2021, the state court staff was informed that Key was in a rehabilitation facility and was expected to be there for some four to six months.  (Docket no. 11-32, p. 1).  There is no indication in the record, nor does Petitioner allege, that these medical issues some two and a half years after the trial in this case affected Key's performance at trial.

E. Sufficiency of the Evidence and Actual Innocence

In his final ground for relief, Petitioner asserts that there is no evidence or insufficient evidence to support his conviction and that he is actually innocent of the crime for which he is accused. In his state habeas petition, he argues that "the essence of the State's case" was hearsay testimony from Marie Cross and Susanna Martinez, which he says was "far from the original statement that was originally given by S.H." He says that the original statement would have resulted in a weaker case for the prosecution and a stronger one for the defense. Petitioner maintains that S.H. made various contradictions and argues that it was impossible for him to be lying on his stomach asleep, with his hands up under his head, and have his penis "reach and touch her or anyone in the position that applicant was laying."  He says that had counsel objected to this "ridiculous and impossible statement" the outcome of the proceeding would have been different.

In reviewing a challenge to the sufficiency of the evidence, the court examines the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).  In conducting this review, the federal habeas court may not substitute its view of the evidence for that of the fact-finder, and disputes among witnesses are within the province of the jury to resolve.  Weeks v. Scott, 55 F.3d 1059, 1061 (5th Cir. 1995).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic to ultimate facts. The court

does not re-evaluate the weight of the evidence or the credibility of the witnesses, and it is not necessary that the evidence exclude every reasonable hypothesis of innocence; rather, the jury is free to choose among reasonable constructions of the evidence. <u>Terry v. Hooper</u>, – F.4th –, 2023 WL 7143145 at *3. (5th Cir., October 31, 2023).

Thus, like claims of ineffective assistance of counsel, habeas claims concerning the sufficiency of the evidence are subject to a "twice-deferential" standard. <u>Id.</u>, *citing* <u>Parker v. Matthews</u>, 567 U.S. 37, 43, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012). The first layer of deference is to the jury's determinations at trial; it is the responsibility of the jury, not the court, to decide what conclusions should be drawn from the evidence admitted at trial, and the jury's verdict may be set aside only if no rational trier of fact could have agreed with the jury. <u>Cavazos v. Smith</u>, 565 U.S. 1, 2, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011).

The second layer of deference is to the state court's decision as to the jury's determinations. A state court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the decision was objectively unreasonable; the federal court may not overturn the state court's decision simply because the federal court disagrees with the decision. <u>Id.</u>, *see also* <u>Parker</u>, 567 U.S. at 43.

S.H.'s testimony by itself is sufficient evidence to allow a rational trier of fact to find guilt beyond a reasonable doubt. <u>Chase v. Scott</u>, 40 F.3d 385, 1994 U.S. App. LEXIS 42340, 1994 WL 652581 (5th Cir., November 9, 1994) (uncorroborated testimony of eight-year-old victim was sufficient to support a conviction for aggravated sexual assault of a child); Tex. Code Crim. Pro. art. 38.07 (Vernon 2011). Whether this testimony was credible or believable was a question for the jury to determine. Although Petitioner suggests that counsel should have objected to this testimony as "ridiculous and impossible," this is not a valid objection. *See* <u>Mays v. Cain</u>, civil action no. 08-3983, 2011 U.S. Dist. LEXIS 61545, 2011 WL 2295173 (E.D.La., June 9, 2011) (rejecting claim that counsel did not object to officer's allegedly "physically impossible testimony" because counsel "had no basis for objecting to a factual account of the crime given by an eyewitness"). Petitioner has not shown that no rational trier of fact could find him guilty based upon the evidence presented,

nor that the state court's decision on his claim was objectively unreasonable. His claim on this point is without merit.

F. An Evidentiary Hearing?

Petitioner states in his petition that "an evidentiary hearing is requested." 28 U.S.C. §2254(e)(2) provides that if the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that the claim relies on (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and, the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

Where a petitioner is not barred from obtaining a hearing by §2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court. In making this decision, the district court must consider whether such a hearing could enable the applicant to prove the petition's factual allegations which, if true, would entitle him to relief. The court must take into account the deferential standards of 28 U.S.C. §2254; thus, it follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, the district court is not required to hold an evidentiary hearing. Schriro, 550 U.S. at 474, *citing* Clark v. Johnson, 202 F.3d 760, 767 (5th Cir. 2000) (no hearing is required when the applicant has failed to present clear and convincing evidence to rebut the state court's factual findings); *see also* Luna v. Lumpkin, 832 F.App'x 849, 2020 U.S. App. LEXIS 33346, 2020 WL 6228008 (5th Cir., October 22, 2020) (an evidentiary hearing is not required on issues which can be resolved by reference to the state court record).

The record in the present case refutes Petitioner's factual allegations and his claims can be resolved by reference to the state court record. Consequently, Petitioner is not entitled to an evidentiary hearing.

**IV. Conclusion**

Title 28 U.S.C. § 2254(d) provides that in order to be granted a writ of habeas corpus in federal court, a petitioner must show that the state court's adjudication of his claim resulted in a decision which was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Moore v. Cockrell, 313 F.3d 880, 881 (5th Cir. 2002).

An "unreasonable" application of federal law is different from an "incorrect" application of federal law. Renico v. Lett, 559 U.S. 766, 773, 130 S.Ct. 1855, 176 L.Ed.2d 678 (2010). This means that a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly; rather, the decision must be "objectively unreasonable," a standard which creates a substantially higher threshold for obtaining relief than de novo review. Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007).

The "contrary to" clause of § 2254(d)(1) applies when a state court fails to apply a legal rule announced by the Supreme Court or reaches a result opposite to a previous decision of the Supreme Court on materially indistinguishable facts. The "unreasonable application" clause of § 2254(d)(1) applies when the state court correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case. Dorsey v. Stephens, 720 F.3d 309, 314 (5th Cir. 2013), (citations omitted). The AEDPA thus imposes a "highly deferential standard for evaluating state court rulings" and "demands that state court decisions be given the benefit of the doubt." Renico, 559 U.S. at 773, 130 S.Ct. 1855 (citations omitted).

In this regard, the Fifth Circuit has explained that "federal habeas review under AEDPA is therefore highly deferential. The question is not whether we, in our independent judgment, believe that the state court reached the wrong result. Rather, we ask only whether the state court's judgment was so obviously incorrect as to be an objectively unreasonable resolution of the claim." Cardenas v. Stephens, 820 F.3d 197, 201-02 (5th Cir. 2016). State courts' findings of fact are entitled to a

presumption of correctness and a petitioner can only overcome this presumption through clear and convincing evidence. Reed v. Quarterman, 504 F.3d 465, 49 (5th Cir. 2007).

Petitioner has failed to show that the state court's adjudication of his claim resulted in a decision which was contrary to or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. His claims for habeas corpus relief are without merit.

Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding unless a circuit justice or judge issues a certificate of appealability. 28 U.S.C. §2253(c)(1)(A). A district court may deny a certificate of appealability *sua sponte* because the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before that court. *See* Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000).

The prerequisite for a certificate of appealability is a substantial showing that the petitioner has been denied a federal right. Newby v. Johnson, 81 F.3d 567, 569 (5th Cir. 1996). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further. Miller-El v. Cockrell, 537 U.S. 322, 327, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

Petitioner has not shown, nor does the record indicate, that jurists of reason could disagree with the district court's resolution of his claims or that the issues presented are adequate to deserve encouragement to proceed further. Consequently, he is not entitled to a certificate of appealability.

RECOMMENDATION

It is accordingly recommended that the above-styled application for the writ of habeas corpus be dismissed with prejudice. It is further recommended that a certificate of appealability be denied *sua sponte*.

26

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found. An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See* Battle v. United States Parole Commission, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error. Duarte v. City of Lewisville, 858 F.3d 348, 352 (5th Cir. 2017).

**So ORDERED and SIGNED this 16th day of November, 2023.**

JOHN D. LOVE
UNITED STATES MAGISTRATE JUDGE

27